UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

A.T. and P.N,

        Plaintiff,

vs.

PROGENESIS, INC.

        Defendant.

CASE NO.:  6:26-cv-01418

### AMENDED COMPLAINT

Plaintiffs, A.T. and P.N. (hereinafter referred to as the "Plaintiffs") bring this Complaint against Defendant, PROGENESIS, INC.  (hereinafter referred to as "Defendant") and allege as follows:

### PARTIES

1. Plaintiffs are citizens of Orlando, Florida and had fertility treatments in Orlando, Florida. Given the sensitive nature of their claim, Plaintiffs are using pseudonym to protect their privacy. Plaintiffs will seek appropriate permission to proceed under this pseudonym if required by Defendant.

2. Defendant Progenesis, Inc. (hereinafter referred to as "Progenesis") is incorporated in California and has its principal address at 4150 Regents Park Row, Suite 245, La Jolla, California 92037.

3. During the relevant time period, Progenesis performed pre-implantation genetic testing for aneuploidy ("PGT-A" or "PGT-A testing").

- 1 -
AMENDED COMPLAINT

4. During the relevant time period, Progenesis sold "PGT-A" as an add-on to IVF treatment at the Plaintiffs' clinic, IVF Orlando, Inc., d/b/a Fertility Center of Orlando (hereinafter referred to as "IVF Orlando").

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

6. Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendant conducts business in this District.

## FACTUAL BACKGROUND

7. Plaintiffs wanted to build their family.

8. In August 2019, Plaintiffs went to IVF Orlando to continue fertility treatments and attempt to have a baby though in vitro fertilization ("IVF") with PGT-A.

9. The process of IVF starts with medication to stimulate the follicles to create several mature eggs for collection. Once the eggs are retrieved from the ovaries, they are then fertilized by the fertility clinic with sperm to create embryos. If the embryos reach the blastocyst stage, they are then ready for implantation to see if they result in a pregnancy.

10. In an effort to increase the success of this process, PGT-A was created as an add-on to the process to screen the embryos and determine which are best suited for implantation.

- 2 -

AMENDED COMPLAINT

11. If the PGT-A testing product is purchased from Defendant, then a biopsy is taken from the trophectoderm component of the embryo (meaning the outer layer of the blastocyst) after the embryo reaches the blastocyst stage of development.

12. During the biopsy, the embryologist creates a hole in the embryo's zona pellucida which allows for the removal of five to ten cells from the trophectoderm component of the embryo.

13. The biopsy is sent to Defendant for PGT-A testing to be performed.

14. Meanwhile, the embryos are frozen and stored with the IVF clinic while PGT-A testing is performed by Defendant.

15. Test results are then provided by Defendant to the IVF clinic and to the patient.

16. Based on those results, it is determined which embryos are "euploid" or best suited for implantation and which embryos are "aneuploid" or abnormal and not suited for implantation.

17. Embryos are fragile and vulnerable to damage from biopsy and the process necessary for PGT-A testing to be performed.[1]

18. Defendant markets and sells PGT-A testing to individual undergoing IVF to build their family. Specifically, PGT-A tests are marketed by Defendants as (a) 97-98% accurate; (b) increasing the chance of implantation, (c) increasing the likelihood of a successful pregnancy, (d) decreasing the risk of miscarriage, (e) reducing the time and costs of having a healthy baby, and (f) benefiting couples of all ages undergoing IVF, especially those of advanced maternal age which Defendant identifies as above 35.

---

[1] Aluko, A., et al., *Multiple cryopreservation – warming cycles, coupled with blastocyst biopsy, negatively affect IVF outcomes.* Reproductive Biomedicine Online. Vol. 42, Issue 3. March 2021.

AMENDED COMPLAINT

19. However, Defendant's PGT-A testing has never been validated and the benefits as stated by Defendant have no scientific support.

20. Research has shown that the representations made by Defendant are false. Studies have found that when looking at clinic pregnancy, miscarriage, or live-birth rates, there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A.[2]

21. Further, research has shown that the accuracy rating for PGT-A is significantly lower than 97%.[3]

22. Defendant's false statements have severe consequences on the Plaintiffs who decided to purchase PGT-A from Defendant based upon these statements.

23. Ensuring adequate quality control for any PGT-A testing is also of critical importance given the enormous value of human embryos to their families.

24. Defendant is aware of the lengths to which IVF patients go to create embryos, their emotional and financial investment in assuring the viability of their embryos, and their expectations that the testing of said viability is accurate.

25. Inaccurate testing can result in the unnecessary harm and destruction of embryos.

26. Inaccurate testing can result in embryos being unable to be transferred.

---

[2] Yan, J., et al., *Live Birth with or without Preimplantation Genetic Testing for Aneuploidy,* N. Engl. J. Med. 385;22, November 25, 2021; Kucherov, A. et al. *PGT-A is associated with reduced cumulative live birth rate in first reported IVF stimulation cycles age ≤; an analysis of 133,494 autologous cycles reported by SART CORS*, Journal of Assisted Reproduction and Genetics (2023) 40:137-149; Munne, S., et al., *Preimplantation genetic testing for aneuploidy versus morphology as selection criteria for single frozen-thawed embryo transfer in good-prognosis patients: a multicenter randomized clinical trial.* Fertility and Sterility, Vol. 112, No. 6, December 2019; Practice Committee of the American Society for Reproductive Medicine and the Society for Assisted Reproductive Technology, *The use of preimplantation genetic testing for aneuploidy: a committee opinion.* Fertility and Sterility. Vol. 122, Issue 3. September 2024.
[3] Marin, D., et.al. *Preimplantation genetic testing for aneuploidy: A review of published blastocyst reanalysis concordance data.* Prenatal Diagnosis. Vol. 4, Issue 5. Pp. 545-553. April 2021.

AMENDED COMPLAINT

27. Embryos are precious and irreplaceable. Human eggs, also known as oocytes, are a limited resource. A woman has about one million eggs at birth and this supply diminishes at a rate of about 1,000 eggs per month. This decline is part of the natural aging process and is commonly referred to as a woman's biological clock.

28. The loss of oocytes from the ovaries continues in the absence of menstrual cycles, and even when women are pregnant, nursing, or taking oral contraceptive.

29. Egg quality too diminishes with time, with miscarriages and chromosomal abnormalities occurring more frequently for older women.

30. The results of PGT-A testing have substantial ramifications for those seeking to become parents, both physically and mentally.

31. Plaintiffs have suffered irreparable harm due to the actions of the Defendants.

32. Defendant's actions as well as their false and misleading statements had severe consequences, including the expenditure of thousands of dollars by Plaintiffs as well as emotional damages.

33. Significant, important decisions about family building and how to proceed with treatment were made by the Plaintiffs based upon the results of Defendant's PGT-A testing.

34. When the testing results are inaccurate and the testing does not perform as sold, those results have a detrimental effect.

35. Plaintiffs were sold PGT-A testing as an add-on to their IVF treatment.

36. Plaintiffs purchased PGT-A based upon Progenesis' claims that its PGT-A testing is (a) 97-98% accurate; (b) increases the chance of implantation, (c) increases the likelihood of a successful pregnancy, (d) decreases the risk of miscarriage, (e) reduces the time and costs of having a healthy baby, and (f) benefits couples of all ages undergoing IVF, especially those of advanced maternal age which Defendant identifies as above 35.

- 5 -

AMENDED COMPLAINT

37. Plaintiffs went through eleven (11) rounds of IVF treatment with PGT-A testing.

38. Plaintiffs were directly marketed these claims made by Defendant.

39. Plaintiffs viewed the Defendant's misleading and fraudulent claims to sell PGT-A prior to their purchase of testing through Defendant's marketing materials, including Defendant's website, videos, and consent form.

40. During Plaintiffs' first round of IVF treatment, on November 4, 2019, biopsies were taken by IVF Orlando from five of Plaintiffs' embryos and shipped to Defendant.

41. On November 10, 2019, Defendant issued a report stating that three of the embryos were "abnormal" and not suitable for transfer and two were "normal".

42. Based upon the results, a "euploid" embryo transfer was conducted on November 4, 2019, which resulted in a pregnancy.

43. Plaintiffs miscarried on or about December 10, 2019.

44. Plaintiffs lost the opportunity to transfer three embryos.

45. Due to the testing results, Plaintiffs had to conduct additional IVF.

46. During Plaintiffs' second round of IVF treatment, on February 14, 2020, biopsies were taken by IVF Orlando from four of Plaintiffs' embryos and shipped to Defendant.

47. On February 20, 2020, Defendants issued a report stating that the two embryos were "abnormal" and two embryos were "normal".

48. Based upon the results, a "euploid" embryo transfer was conducted on May 19, 2020, but did not result in pregnancy.

49. Plaintiffs lost the opportunity to transfer two embryos.

50. Due to the testing results, Plaintiffs had to conduct additional IVF.

- 6 -
AMENDED COMPLAINT

51. During Plaintiffs' third round of IVF treatment, on August 20, 2020, a biopsy was taken by IVF Orlando from Plaintiffs' one embryo and shipped to Defendant.

52. On August 26, 2020, Defendants issued a report stating that the one embryo was "abnormal".

53. Plaintiffs lost the opportunity to transfer the embryo.

54. Due to the testing results, Plaintiffs had to conduct additional IVF.

55. During Plaintiffs' fourth round of IVF treatment, on November 16, 2020, biopsies were taken by IVF Orlando from two of Plaintiffs' embryos and shipped to Defendant.

56. On November 29, 2020, Defendants issued a report stating that the one of the embryos was "abnormal" and one was "mosaic".

57. Plaintiffs lost the opportunity to transfer two embryos.

58. Based upon the testing results, Plaintiffs had to conduct additional IVF.

59. During Plaintiffs' fifth round of IVF treatment, on February 20, 2021, biopsies were taken by IVF Orlando from four of Plaintiffs' embryos and shipped to Defendant.

60. On March 1, 2021, Defendant issued a report stating that three of the embryos were "abnormal" and one was "normal".

61. Plaintiffs lost the opportunity to transfer three embryos.

62. Based upon the testing results, Plaintiffs had to conduct additional IVF.

63. During Plaintiffs' sixth round of IVF treatment, on June 27, 2021, biopsies were taken by IVF Orlando from two of Plaintiffs' embryos and shipped to Defendant.

64. On July 4, 2021, Defendants issued a report stating that the two embryos were "abnormal".

65. Plaintiffs lost the opportunity to transfer three embryos.

66. Based upon the testing results, Plaintiffs had to conduct additional IVF.

67. During Plaintiffs' seventh round of IVF treatment, on December 1, 2021, biopsies were taken by IVF Orlando from three of Plaintiffs' embryos and shipped to Defendant.

68. On December 16, 2021, Defendant issued a report stating that all three of the embryos were "normal".

69. Based upon the testing results, Plaintiffs conducted additional IVF.

70. During Plaintiffs' eighth round of IVF treatment, on January 17, 2022, biopsies were taken by IVF Orlando from two of Plaintiffs' embryos and shipped to Defendant.

71. On January 28, 2022, Defendants issued a report stating that the two embryos were "abnormal".

72. Plaintiffs lost the opportunity to transfer two embryos.

73. An "euploid" embryo transfer was conducted on October 26, 2022, but did not result in pregnancy.

74. Then another "euploid" embryo transfer was conducted on December 7, 2022, but did not result in pregnancy.

75. Based upon the testing results and unsuccessful transfers of "euploid" embryos, Plaintiffs had to conduct additional IVF.

76. During Plaintiffs' ninth round of IVF treatment, on December 13, 2024, biopsies were taken by IVF Orlando from three of Plaintiffs' embryos and shipped to Defendant.

77. On December 23, 2024, Defendants issued a report stating that two of the embryos were "abnormal" and one embryo was "normal".

78. Plaintiffs lost the opportunity to transfer two embryos.

79. Based upon the testing results, Plaintiffs had to conduct additional IVF.

AMENDED COMPLAINT

80. During Plaintiffs' tenth round of IVF treatment, on March 21, 2025, biopsies were taken by IVF Orlando from three of Plaintiffs' embryos and shipped to Defendant.

81. On April 3, 2025, Defendants issued a report stating that all three embryos were "abnormal".

82. Plaintiffs lost the opportunity to transfer three embryos.

83. Based upon the testing results, Plaintiffs had to conduct additional IVF.

84. During Plaintiffs' eleventh round of IVF treatment, on September 2, 2025, biopsies were taken by IVF Orlando from two of Plaintiffs' embryos and shipped to Defendant.

85. On September 11, 2025, Defendants issued a report stating that the two embryos were "abnormal".

86. Plaintiffs lost the opportunity to transfer two embryos.

87. Based upon the testing results, Plaintiffs had to conduct additional IVF.

88. On or about March 31, 2026, Plaintiffs became aware of the closure of IVF Orlando.

89. Plaintiffs had transferred all their embryos with a "normal" result and none had implanted or resulted in a pregnancy.

90. Thus, Plaintiffs requested that all of their remaining stored embryos be transferred to a new clinic.

91. Plaintiffs were informed that they were unable to transfer and/or move any of their "abnormal " embryos because all nineteen (19) embryos with an "abnormal" result from eleven cycles of IVF had been discarded based upon the results of Defendant's PGT-A testing and were therefore unavailable for transfer, re-biopsy, retesting, storage, or future reproductive use.

AMENDED COMPLAINT

92. Plaintiffs were also informed that they were unable to transfer and/or move any of their "mosaic " embryo because it had been discarded based upon the results of Defendant's PGT-A testing and was therefore unavailable for transfer, re-biopsy, retesting, storage, or future reproductive use.

93. Plaintiffs would have retained those embryos had they known the truth about the limitations of Defendant's PGT-A.

94. Plaintiffs were deprived of the opportunity to transfer, retest, re-biopsy, donate, or preserve those embryos.

95. Plaintiffs relied upon Defendant's testing results and representations concerning the reliability and accuracy of PGT-A when counseling Plaintiffs regarding embryo disposition and transfer decisions.

96. Plaintiffs would not have purchased PGT-A testing and would not have been damaged had they known Defendant's PGT-A testing has never been validated and the benefits as stated by Defendant have no scientific support.

97. Plaintiffs have suffered economic and emotional loss.

98. Plaintiffs have lost the opportunity to transfer their embryos.

99. Plaintiffs have lost time to pregnancy as well as reproductive autonomy.

100.    Plaintiffs' reproductive potential has been reduced due to the additional time for treatment based upon Defendant's PGT-A testing.

101.    Plaintiffs had to conduct additional IVF cycles due to Defendant's PGT-A testing.

AMENDED COMPLAINT

**CAUSES OF ACTION**

**COUNT I**
**Negligence**

102.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

103.    At all times relevant hereto, Defendants and their agents and/or employees undertook to provide specialized laboratory services in connection with Plaintiffs' IVF treatment, including but not limited to the biopsy, handling, amplification, testing, analysis, and reporting of Plaintiffs' embryos.

104.    Defendants had a duty to exercise the level of care, skill, and diligence ordinarily possessed and exercised by reasonably prudent fertility laboratories under similar circumstances.

105.    Defendants breached their duty and the standard of care in all of the following respects:

a.  Failing to have in place and/or compel compliance with protocols and procedures to ensure that PGT-A testing was properly performed;

b.  Failing to adequately determine that the PGT-A testing being performed was accurate;

c.  Failing to adequately determine that the PGT-A testing being performed was analytically and clinically validated; and

d.  Failing to adequately determine that the PGT-A testing was being performed as sold to the Plaintiff;

98. This conduct fell far below the applicable standard of care for a genetic testing laboratory.

- 11 -

AMENDED COMPLAINT

99. As a direct and proximate cause of Defendants' misconduct, Plaintiffs have suffered and will suffer additional damages.

## COUNT II
**Negligent Misrepresentation**

100.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

101.    Defendants represented to Plaintiffs several material facts that Defendants knew were not true, including but not limited to:

a.   Defendants' PGT-A testing is 97-98% accurate;

b.   Defendants' PGT-A testing increases the chance of implantation;

c.   Defendants' PGT-A testing increases the likelihood of a successful pregnancy;

d.   Defendants' PGT-A testing decreases the risk of miscarriage;

e.   Defendants' PGT-A testing reduces the time and costs of having a healthy baby;

f.   Defendants' PGT-A testing benefits couples of all ages undergoing IVF, especially those of advanced maternal age which Defendant identifies as above 35.

102.    Defendants had superior knowledge on PGT-A testing and had a duty to ensure the information was correct.

103.    Defendants knew that these representations were false.

104.    Defendants knew that Plaintiffs would rely on these false statements in deciding to purchase PGT-A testing and making decisions based upon their testing results, and intended that Plaintiffs rely on these false statements.

105.    Plaintiffs reasonably relied on Defendants' representations.

106.    Defendants made false representations, concealments, and non-disclosures to Plaintiffs about their PGT-A testing services and its impact on embryos.

- 12 -

AMENDED COMPLAINT

107.    These misrepresentations were independent of Defendants' contractual duties and induced Plaintiffs to purchase PGT-A testing.

108.    In making these false, misleading, and deceptive representations and omissions, Defendant knew and intended that the Plaintiffs would rely upon the misrepresentations and pay for PGT-A testing services.

109.    Plaintiffs reasonably relied upon Defendant's representations. As a direct and proximate result of the negligent misrepresentations concerning the reliability and accuracy of PGT-A, Plaintiffs were harmed, and Defendants' misrepresentations were a substantial factor in causing harm.

## COUNT III
### Fraudulent Claims

110.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

111.    Defendant's acts and practices constitute fraudulent claims because Defendants fraudulently claimed information that was material to the reason Plaintiffs entrusted their embryos to Defendants for PGT-A testing, including but not limited to, that Defendants represented to the Plaintiffs that:

a.  Defendants' PGT-A testing is 97-98% accurate;

b.  Defendants' PGT-A testing increases the chance of implantation;

c.  Defendants' PGT-A testing increases the likelihood of a successful pregnancy;

d.  Defendants' PGT-A testing decreases the risk of miscarriage;

e.  Defendants' PGT-A testing reduces the time and costs of having a healthy baby;

f.  Defendants' PGT-A testing benefits couples of all ages undergoing IVF, especially those of advanced maternal age which Defendant identifies as above 35.

- 13 -
AMENDED COMPLAINT

112.     Defendant made these claims on their website, marketing and contracts with the Plaintiffs.  Defendant made these claims on their website and contracts with Plaintiffs as well as in their consultations with the Plaintiffs. Defendant knew that these claims were false and made them with the intent that Plaintiffs would rely on them to form their decision to purchase PGT-A testing and utilize Defendant's testing results.

113.     Plaintiffs reasonably relied on Defendant's claims.

114.     Plaintiffs were significantly harmed, as described herein, and Plaintiffs' reliance on Defendants' fraudulent claims were a substantial factor in causing such harm.

115.     This harm includes financial injury, emotional distress, and the loss of embryos.

## COUNT IV
### Negligent Infliction of Emotional Distress

116.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

117.     Defendant negligently misrepresented the quality, reliability and accuracy of its PGT-A testing services.

118.     Defendant convinced Plaintiffs to purchase PGT-A testing based upon false and misleading statements.

119.     Defendant also convinced Plaintiffs to make serious decisions based upon the results of PGT-A testing.

120.     In fact, by indicating that embryos with an "abnormal" or "aneuploid" result were not suitable for transfer, Defendant severely impacted Plaintiffs' decisions based upon PGT-A.

- 14 -

AMENDED COMPLAINT

121.    Due to the actions of the Defendant, Plaintiffs lost nineteen of their embryos.

122.    Due to the actions of the Defendant, Plaintiffs lost months of treatment, had additional retrievals done, and were unable to transfer embryos that may have been suitable for transfer but were discarded.

123.    Defendant's negligent actions resulted in serious emotional distress to Plaintiffs which was suffered because of the Defendant's testing, deceptive and misleading representations and omissions about its PGT-A testing, which caused the discarding of Plaintiffs' embryos which led to loss of time for fertility treatments, additional retrievals, and the loss of embryos.

124.    For these reasons, Plaintiffs have suffered significant emotional damage.

125.    Defendant knew their actions would result in negligent infliction of emotional distress on the Plaintiffs given the likelihood of genuine and serious mental distress from inaccurate testing, deceptive and misleading representations and omissions about PGT-A testing, the additional rounds of IVF due to their PGT-A testing, and the improper discarding of embryos which Plaintiffs were then unable to maintain, store and ultimately transfer.

126.    This claim is asserted as a derivative of Defendant's fraud and negligence, not as a wholly independent cause of action.

### COUNT V
**Violations of the Florida Deceptive and Unfair Trade Practice Act,
Sections 501.201-501.213**

127.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

AMENDED COMPLAINT

128.    Plaintiffs are "consumers" within the meaning of Fla. Stat. §501.203.

129.    Defendant is engaged in "trade" and "commerce" within the meaning of Florida Statute §501.203 as they market, promote, and sell PGT-A testing for sale to consumers within the State of Florida.

130.    Defendant's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct.

131.    Defendant used and employed deceptive and unfair methods of competition and unfair or deceptive acts, practices, and or representations in the conduct of trade or commerce.

132.    Defendant's acts and practices offend public policy as established by statute. Defendant's acts and practices violate the Federal Trade Commission Act, which provides that "unfair or deceptive acts or practices in or affecting commerce . . . are . . . declared unlawful." 15 U.S.C. Sec. 45(a)(1).  An act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

133.    Defendant's acts and practices are fraudulent, willful, knowing, or intentional, immoral, unethical, oppressive, and unscrupulous.

134.    Defendant's conduct is substantially injurious to consumers. Such conduct has, and continues to cause, substantial economic injury to consumers because consumers would not have paid for Defendant's PGT-A testing and other related costs but for Defendants' false and misleading statements, omissions, and promotion as detailed throughout this Complaint.

- 16 -

AMENDED COMPLAINT

135. Consumers have thus paid unnecessarily for testing and such injury is not outweighed by any countervailing benefits to consumers or competition.

136. No benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representations and omissions, consumers could not have reasonably avoided such injury.

137. The foregoing unfair and deceptive practices directly, foreseeably, and proximately caused Plaintiffs to suffer an ascertainable loss when they paid for PGT-A testing based on Defendant's false and misleading material statements and omissions.

138. Plaintiffs are entitled to recover damages and other appropriate relief pursuant to Fla. Stat.§§501.211 and 501.2105.

## COUNT VI

### Fraud

139. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

140. Defendant created and implemented a scheme to market its PGT-A to increase sales through false and misleading statements and material omissions, including, for example, that:

   a. Defendants' PGT-A testing is 97-98% accurate;

   b. Defendants' PGT-A testing increases the chance of implantation;

   c. Defendants' PGT-A testing increases the likelihood of a successful pregnancy;

   d. Defendants' PGT-A testing decreases the risk of miscarriage;

   e. Defendants' PGT-A testing reduces the time and costs of having a healthy baby;

AMENDED COMPLAINT

f.  Defendants' PGT-A testing benefits couples of all ages undergoing IVF, especially those of advanced maternal age which Defendant identifies as above 35.

141.    While making the above representations, Defendant also suppressed and omitted material facts from Plaintiffs.

142.    Defendant's conduct was fraudulent and deceptive because its misrepresentations and omissions were likely to and did deceive the Plaintiffs.

143.    Defendant knew or should have known that its misrepresentations and omissions were false and misleading and intended for consumers to rely on.

144.    Plaintiffs have been injured because they paid for PGT-A and suffered economic and emotional losses based upon the material misrepresentations and omissions of Defendant.

145.    Defendant's false statements and omissions induced Plaintiffs to purchase Defendant's PGT-A.

146.    Defendant's advertising, marketing, and promotion of PGT-A fraudulently suppressed and concealed the truth about PGT-A as alleged herein. Accordingly, Plaintiffs could not have known that they were subject to deceptive and misleading marketing and promotion.

147.    Absent Defendant's conduct, Plaintiffs would not have purchased PGT-A from Defendant and are entitled to a full refund of the purchase price and additional economic losses. In the alternative, Plaintiffs are entitled to the difference in value between the unproven and unreliable test that Plaintiffs purchased and the test that Defendant advertised.

148.    As a result of Defendant's false and deceptive conduct, Plaintiffs are entitled to monetary damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

AMENDED COMPLAINT

**COUNT VII**

**Fraud by Concealment**

149.    Plaintiffs incorporate by reference all preceding allegations.

150.    Defendant intentionally suppressed and concealed material facts about its PGT-A testing as alleged herein. Defendant knew about the problems and issues with PGT-A, that it was unproven, inaccurate, and unreliable, as well as the status of scientific knowledge concerning PGT-A but failed to disclose these material facts to Plaintiffs.

151.    Plaintiffs had no reasonable means of knowing that Defendant's representations concerning PGT-A were materially incomplete, false, or misleading, or that Defendant had failed to disclose relevant material facts about PGT-A. Plaintiffs did not and reasonably could not have discovered Defendant's deceit before they purchased PGT-A.

152.    Had Plaintiffs known the truth, and of the material facts that Defendant omitted to disclose to them, they would not have purchased PGT-A from Defendant and utilized the information to make decisions about their IVF treatment thereby incurring economic and emotional damages.

153.    Defendant had a duty to disclose the truth because the facts that Defendant choose not to disclose are material and Defendant possessed knowledge of these facts that Plaintiffs did not have.

154.    Defendant was aware of the scientific study and research concerning PGT-A as Defendant reviewed the research and publications concerning PGT-A, including from major medical associations such as ASRM.

155.    Defendant had a duty to disclose the truth about PGT-A because, through Defendant's advertising, marketing, website statements, patient brochures, consent form, and other written statements made to consumers, Defendant made partial representations regarding PGT-A including purported representations concerning its

AMENDED COMPLAINT

reliability and accuracy, but failed to disclose facts that would have materially qualified those partial representations.

156. Having volunteered purportedly scientific and research-based information relating to PGT-A to Plaintiffs, Defendant had a duty to disclose the whole truth about PGT-A and its unproven, inaccurate, and unreliable nature.

157. Plaintiffs were exposed to Defendant's representations prior to and immediately after purchase. Plaintiffs saw the representations as detailed herein, that were repeated by Defendant throughout its promotional materials. None of the informational sources that Plaintiffs were provided by Defendant, including advertisements, websites, brochures, or promotional materials indicated or disclosed the full truth about PGT-A testing as detailed herein.

158. Defendant concealed the truth to sell more PGT-A testing and to avoid the public finding out the truth about PGT-A.

159. The facts that Defendant suppressed and omitted were material, and Plaintiffs were unaware of them at the time of purchase. Had the facts been disclosed, Plaintiffs would not have purchased PGT-A and incurred the associated economic costs by which they were damaged.

160. When deciding whether to purchase PGT-A, Plaintiffs reasonably relied to their detriment on Defendant's material misrepresentations and omissions as detailed herein.

161. Plaintiffs sustained damages in the form of economic costs as a direct and proximate result of Defendant's deceit and fraudulent concealment.

162. Defendant's fraudulent concealment was malicious, oppressive, deliberate, intended to defraud Plaintiffs, and intended to enrich Defendant, and has been in reckless disregard of Plaintiffs' rights, interests, and well-being. Defendant's conduct warrants an assessment of damages in an amount sufficient to deter such conduct, to be determined according to proof at trial.

AMENDED COMPLAINT

## COUNT VII
### Trespass to Chattels

163.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

164.    Defendant have committed common law trespass to chattel.

165.    Plaintiffs' embryos were at all relevant times their personal property.

166.    Defendant intentionally interfered with Plaintiffs' embryos that have an "abnormal" result based upon Defendant's PGT-A testing.

167.    Specifically, Defendant indicates that embryos reported as "abnormal are considered to be at high risk of chromosomal abnormalities" and thus, not suitable for transfer.

168.    Based upon the results of Defendant's testing, Plaintiffs were unable to transfer or maintain their embryos.

169.    Based upon the results of Defendant's testing, nineteen of Plaintiffs' embryos were discarded.

170.    Plaintiffs were made aware that they were unable to transfer and/or move any of their embryos because all of their embryos with "abnormal" result were discarded.

171.    Defendant intentionally interfered in the Plaintiffs' possession or use of their embryos.

172.    As a direct and proximate result of Defendant's intentional interference, Plaintiffs sustained damages in the form of economic and emotional costs due to the loss of their embryos that do not have a "normal" result based upon Defendants' PGT-A testing.

AMENDED COMPLAINT

**COUNT VIII**
**Unjust Enrichment**

173.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

174.    Plaintiffs declare this remedy in the alternative to their other claims to the extent there is no adequate remedy at law.

175.    Plaintiffs purchased PGT-A testing from Defendant based upon misleading and fraudulent statements and omissions.

176.    Plaintiffs paid for embryo biopsies, freezing and thawing of embryos, additional rounds of IVF treatment, and other associated costs based upon misleading and fraudulent statements and omissions.

177.    Due to Defendant's PGT -A testing and their actions based upon their PGT-A testing, Plaintiffs were harmed and their embryos were discarded.

178.    It is inequitable and unjust for Defendant to retain the amounts received from the Plaintiffs for PGT-A testing and associated costs due to Defendant's failure to provide accurate and complete PGT-A testing and improper discarding of Plaintiff' embryos.

179.    Accordingly, Defendant will be enriched without cause if allowed to retain such funds and must pay restitution to the Plaintiffs in the amount which Defendants were unjustly enriched by Plaintiffs' purchase of PGT-A testing and the improper discarding of their embryos.

- 22 -
AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

180. Plaintiffs demand a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment in their favor and against Defendants, and each of them, as follows:

   a.  Awarding Plaintiffs all compensatory, statutory, restitution, and punitive damages as permitted by law;

   b.  Scheduling a trial by jury in this action;

   c.  Awarding Plaintiffs reasonable attorneys' fees, costs and expenses, as permitted by law;

   d.  Awarding pre and post-judgment interest on any amounts awarded, as permitted by law; and

   e.  Awarding such other and further relief as may be just and proper.

Dated this 30th day of June, 2026.


                                        */s/ Allison S. Freeman*
                                        Allison S. Freeman, Esq.
                                        **CONSTABLE LAW, P.A.**
                                        139 6th Avenue S
                                        Safety Harbor, FL 34695
                                        Phone: (727) 797-0100
                                        Email: allison@constable-law.com

                                        Paula S. Bliss, Esq.
                                        **JUSTICE LAW COLLABORATIVE LLC**
                                        210 Washington Street
                                        No. Easton MA 02356
                                        Phone: (508) 230-2700
                                        Email: paula@justicelc.com

- 23 -

AMENDED COMPLAINT